Filed 9/21/23  P. v. Buitrago CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN MANUEL BUITRAGO,<br><br>Defendant and Appellant. | F083386<br><br>(Fresno Super. Ct. No. F19907940)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  F. Brian Alvarez, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant and defendant John Manuel Buitrago was convicted of three counts of lewd acts upon a child, two counts of sexual intercourse or sodomy with a child under 10 years old, and one count of possession of child pornography.[1]  The trial court sentenced defendant to prison for an aggregate term of 29 years to life.  On appeal, he contends the court should have granted his motion to exclude his pretrial statements to officers because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and any waiver was involuntary and coerced.  We disagree and affirm the judgment.

## FACTUAL BACKGROUND

**Child Pornography Evidence**

On September 26, 2012, Fresno County Sheriff's Deputy David Rippe initiated an investigation of child pornography possession using a specially configured computer. Sergeant Rippe was a detective in the Central California Internet Crimes against Children Task Force.  He investigated well over 100 child pornography cases and received over 600 hours of training in computer forensics and peer-to-peer file sharing technology. Rippe used his computer to access a peer-to-peer file sharing network named Ares on the date of his investigation.

The Ares file sharing network allows a person who possesses a file on their computer to share the file with other people, and it also enables them to receive files from other people as well.  Once a user has installed the Ares program to their computer, they are able to search any shared files from all computers connected to the file sharing network for specific content.  The files must be downloaded from the search results by the user in order to be stored on the user's computer.  Sergeant Rippe's computer allowed

---

[1] Defendant's first jury trial resulted in convictions for possession of child pornography and lewd act with a minor.  The court declared a mistrial on the four remaining counts because the jury could not reach a verdict in April 2020.  Defendant's second jury trial resulted in convictions on the four remaining counts in August 2021.

him to search for files using specific terms designed to locate potential child pornography files and download them without sharing the files in return.

Sergeant Rippe began his investigation by establishing a connection with a computer in the local area and downloading four child pornography videos from the computer. He then determined the physical address for the computer by obtaining an internet protocol (IP) address for the internet subscriber that was using the computer. There were 44 files containing child pornography discovered in relation to the computer user's IP address. Rippe observed the four video files downloaded from the computer, and he confirmed that the videos depicted child pornography. Based upon these findings, Rippe obtained a search warrant for the physical address associated with the computer's IP address.

The search warrant was executed on the afternoon of October 4, 2012, at the home of defendant. Defendant was present along with his wife and two children. Sergeant Rippe and a special agent from Homeland Security interviewed defendant in one of the children's bedrooms while the search warrant was executed. Defendant told Rippe that videos containing child pornography would "pop up" when he was looking for pornography. Rippe testified that the videos of child pornography would not just "pop up," but the user would have to make an affirmative action to download the videos. Defendant also claimed he accidentally downloaded child pornography on occasion, and he would delete the child pornography files once he discovered them in his files. During the search, Rippe was able to confirm that one of the files previously downloaded from the computer prior to the search warrant was a match to one of the video files located on defendant's computer.

A forensic examination of defendant's computer was conducted by Clovis Police Officer Dustin Dodd. Dodd's analysis of the hard drive from the computer indicated that defendant was its main user. Four videos located on the computer contained child pornography. Three of the videos were stored in the computer's recycle bin, and one of

the videos was stored in a shared folder. The videos in the recycle bin were created and accessed in either September 2012 or October 2012. The video in the shared folder was created and accessed on the morning of October 2, 2012.

Officer Dodd also located numerous images showing children dressed and posed provocatively, however, these images were not illegal. The computer's search history was found to be consistent with keywords for locating child pornography. Based upon Dodd's training and experience investigating child pornography cases, the presence of child pornography could not reasonably be the result of a search for young-adult female pornography.

**Child Sexual Assault Evidence**

Confidential victim (C.V.) was related to defendant through a marriage in the family.[2] Defendant's family and C.V.'s family regularly spent time together as she was growing up. In July 2015, C.V. was seven years old when she stayed at defendant's home for a week. Defendant touched C.V. in a way that she did not like when she was sleeping at defendant's home. C.V. woke up at night to use the restroom when defendant told her to sit with him while he watched television. Defendant told C.V. to take off her underwear and she complied. He put gel on his penis and rubbed his penis on her vagina. C.V. was confused because she did not know what was happening, and defendant told her to keep it a secret.

C.V. stayed at defendant's home another day or two after the assault, but she did not tell anyone in defendant's home about what happened. Shortly after returning home, C.V. told her mother about the incident. Her mother took C.V. to the hospital and contacted law enforcement. C.V. provided a statement to law enforcement in a forensic interview a few days after visiting the hospital. Her mother described C.V. as a "different

---

[2] C.V. was 12 years old at the time of her testimony in the first trial, and she was 13 years old at the time of her testimony in the second trial.

kid" since she was touched by defendant. C.V. no longer trusted people and was "anxious all the time."

**Defense Evidence**

Defendant testified on his own behalf during his first trial. He indicated that he was in special education classes from an early age through high school. Defendant had learning disabilities and difficulty reading and writing. He denied ever searching for child pornography, and he insisted that he only searched the internet for adult pornography. Defendant also denied ever touching C.V. inappropriately, and he claimed to be in bed on the night C.V. was assaulted.

A clinical psychologist, Dr. Harold Seymour, performed a psychological evaluation of defendant in late 2013. He conducted a clinical interview with defendant and reviewed records dating back to his early childhood. Dr. Seymour diagnosed defendant as having a mild intellectual disability and attention deficit disorder. He also reviewed the transcript of defendant's interview with law enforcement, and he believed defendant was not processing everything the officers were asking him. Dr. Seymour also explained how a person's memory can be affected by an authority figure inserting false information while discussing an experience.

## DISCUSSION

Defendant argues that the trial court erred by concluding that he knowingly and intelligently waived his rights pursuant to *Miranda*, *supra*, 384 U.S. at page 444, during his interview with law enforcement. He cites his learning disability and supposedly "coercive" conduct by law enforcement as reasons that his waiver was invalid. Defendant also contends, for the first time on appeal, that certain incriminating statements to law enforcements were involuntary due to "threatening behavior" by the officers.

5.

## I.  Factual Background

### A.  *Pretrial Proceedings*

At a hearing prior to defendant's first trial, the trial court granted the People's request for a hearing pursuant to Evidence Code section 402 to determine the relevance of Dr. Seymour's testimony.  Defendant's counsel indicated that Dr. Seymour would testify about defendant's learning disabilities and statements to police officers.  The People suggested the trial court should consider narrowing the scope of Dr. Seymour's testimony because his report "opines to legal conclusions as to whether the defendant understood *Miranda*, whether he could give a knowing, voluntary waiver."

The trial court granted the People's motion to introduce defendant's October 2012 interview with law enforcement during the pretrial hearing.  Defendant's counsel acknowledged that he wasn't currently requesting for the statement to be suppressed after stating, "it seemed voluntary, so I don't think I have a basis to challenge the voluntariness of it right now.  [A]lthough I could make some argument with Dr. Seymour, but I think … the officers weren't aware of that at the time they were taking the statement."

At a February 27, 2020, Evidence Code section 402 hearing, Dr. Seymour testified as to his opinion that defendant lacked the capacity to understand that he could exercise his right to remain silent during the law enforcement interview.  Dr. Seymour acknowledged that he only reviewed the transcripts of defendant's interview with law enforcement, and he was not provided a copy of the audio recording from the interview.  The People argued that Dr. Seymour's testimony was not relevant because defendant's ability to understand the *Miranda* warning and voluntarily waive his rights was an issue of law for the court to decide.  Defendant's counsel clarified that he was still "waiting to see" if he intended to file a motion under *Miranda* to establish whether defendant understood that he had a right to remain silent.  His stated purpose in offering Dr. Seymour's testimony was to establish defendant's developmental disability and "lack

6.

of sophistication with computers." The trial court then insisted that their arguments will be limited to those two issues instead of *Miranda*.

In discussions the following day, defendant's counsel expressed his intention to "file a motion in regards to [defendant's] statement," and he suggested an Evidence Code section 402 hearing pertaining to *Miranda*. Defendant's counsel anticipated that the People would introduce defendant's statement regarding the child pornography. The trial court set an Evidence Code section 402 hearing to address "the *Miranda* issue." On March 10, 2020, the evidentiary hearing was held "pertaining to *Miranda* and [defendant]'s statements." The trial court heard testimony from Sergeant Rippe, listened to portions of the audio recording of defendant's interview with law enforcement, and considered Dr. Seymour's testimony from the previous Evidence Code section 402 hearing.

**B.** ***Defendant's Interview with Law Enforcement***

On October 4, 2012, Sergeant Rippe participated in the execution of a search warrant at defendant's residence for evidence of possession and distribution of child pornography. The search took place around 1:40 p.m., and 12 to 20 officers were present during the search. The officers were wearing tactical gear and carrying firearms. Defendant's family was escorted out of the home, and defendant was initially handcuffed while officers completed a sweep of the home. The family was not told about the type of evidence that law enforcement was searching for. Rippe asked defendant to come inside the home after his handcuffs were removed.

Defendant was taken to his daughter's bedroom while investigators moved throughout the house to search for computer equipment. The bedroom door was closed for the majority of defendant's interview with Sergeant Rippe to minimize the background noise from the search. Department of Homeland Security Agent Fletes was also present for the majority of the interview. Rippe exited the bedroom to speak with other investigators at one point of the interview. The recording was stopped when Rippe

left the bedroom to speak with defendant's wife. The recording was restarted, and the second portion of the interview began. The interview lasted at least an hour. According to Rippe, defendant appeared to understand the questions being asked and responded appropriately.

Sergeant Rippe began the interview by informing defendant that he was not under arrest. He also clarified that defendant was able to leave at any time and refuse to speak with law enforcement. Defendant then expressed his desire to know what was happening. Rippe responded as follows, "Before I can explain to you what's going on, I want to read you your *Miranda* [r]ights. A lot of people think when you hear your *Miranda* Rights that means, oh am I in trouble? Am I in jail? Am I going to jail? That's not what that means, it just means that you have rights and I want to read them to you so you understand them, and once you have those understood, then I can explain to you everything that's going on. Defendant said "Okay" in response.

Sergeant Rippe used a *Miranda* form from the Department of Homeland Security to read defendant his rights. Rippe went through defendant's right to remain silent, have an attorney present, and stop questioning at any time. Defendant responded "yes" each time Rippe asked if he understood one of the rights that was read to him. Rippe showed defendant the form and requested his signature on the form. As defendant was shown the form, Rippe explained, "It says right here, I've had the above rights read [and] explained to me and I fully understand these rights. I waive them freely and voluntarily without threat or intimidation and without any promise to (unintelligible). It says right here, "I was taken into custody at blank time," I crossed that out cause you're not in custody. So, this is just an acknowledgment that you understand your right."

Defendant explained that he felt "kind of threatened" with all the law enforcement officers present, and he said, "I don't even know what the hell is going on." Sergeant Rippe pointed out that the officers put their guns away and defendant was free to leave at any time. Agent Fletes interjected by stating, "Basically, you do have rights because

8.

we're here in your home. You may feel like you're not free to go. And that's the only reason we have to read you your rights not because you're under arrest, that would be different. … We would be telling you, "You're under arrest and this is why." … Just because we're here in your house and you may feel like you're not free to leave, we have to, we have to advise you of your rights." Defendant responded with "okay" multiple times as Fletes continued explaining the purpose of the advisement of his rights:

> "We want to explain to you, um, and to do that we need you to say, 'Yeah, I'm willing to do that voluntarily, willfully with no….' We're not threatening you in any way to do what he's telling you, you're free to leave anytime. [W]e just want to make sure if you're willing to talk to us, you're waiving … waiving those rights and to answer some questions for us and us to explain it to you. That's the only reason why we're reading your rights right now because you may feel like you're not free to go. … So that signing something we all witnessed that you do […] agree to talk to us. That you do acknowledge your rights. And, and, and that way you can't say something that wasn't, or I can't say that you said something cause we're all signing as witnesses that we're all in agreement here to answer questions."

Agent Fletes concluded by asking if defendant fully understood his explanation, and defendant responded, "Yeah, I understand what you're saying." Defendant initially signed the form on the wrong line, but the officers helped him to correct his signature. Once the form was signed by defendant, Sergeant Rippe informed defendant that a judge authorized a search of the home without further detail.

Sergeant Rippe asked defendant several basic questions to allow him to determine who frequented the home and used the computers in the home. Defendant had two teenage stepbrothers that came to the home about once per week for a few hours. He noted that the stepbrothers used the desktop computer to play games. Defendant's wife used a laptop for work and defendant often used a tablet. Defendant continued asking for an explanation as to why law enforcement was present, and Rippe indicated that the investigation involved computers. The officers gathered additional information about

9.

defendant's work schedule and computer usage before disclosing their investigation for child pornography.

Defendant told the officers, "There ain't no child pornography here guys." Sergeant Rippe revealed that he was able to download child pornography from defendant's IP address, but defendant continued to deny having any knowledge about child pornography being present on computers in the home. Defendant volunteered that his stepbrothers were in the home on the previous day as Rippe explained that law enforcement was searching defendant's computers. Defendant acknowledged that he came across child pornography by accident while he was searching for adult pornography. Agent Fletes eventually took over the questioning while Rippe went to speak with the computer forensic team.

Agent Fletes informed defendant that his computers would be kept until they were cleared by the forensic team and that it could take a while to get them back. Defendant became frustrated and stated he would sue someone over the seizure of his computers and tablet. He told Fletes that forensics would not find child pornography on his tablet, and he claimed to have nothing to hide. However, he believed law enforcement was still there to arrest someone in the house, and he felt that Fletes would place any blame on defendant. Fletes explained that the officers merely find facts and evidence to present to the prosecution, and he further clarified that "it's not our decision to reach, eventually it's a judge's decision, so."

The interview resumed with Sergeant Rippe seeking information about how defendant obtained one of the laptops in the home. Defendant told Rippe that he would delete any videos that contained child pornography on the few occasions that he accidentally downloaded them. As the interview continued, defendant began suggesting that the officers should take the computers and leave the residence. However, Agent Fletes indicated that the search warrant authorized them to have control over the home until their search was complete.

10.

The second portion of the interview began after Sergeant Rippe finished speaking with defendant's wife. Defendant's wife told Rippe that defendant came home from work around 3:00 p.m. or 4:00 p.m. on the previous day. Rippe asked defendant about his whereabouts during the previous day before telling him that a video of child pornography was opened at 5:19 p.m. Defendant initially claimed he was not home from work until later, but he eventually admitted that he was home looking at pornography at that time. Defendant continued to deny that he purposely downloaded child pornography, and he told Rippe that child pornography would sometimes "pop up." At the conclusion of the interview, Rippe placed defendant under arrest.

## C. *Argument and Ruling in Trial Court*

At the conclusion of the evidentiary portion of the hearing, the trial court requested the prosecution begin with argument because they were proffering the defendant's interview as evidence. The prosecutor argued that it was "very clear" that defendant was provided his *Miranda* warnings even though he was not placed under arrest. He asserted that there was no *Miranda* violation that should result in the defendant's statement being excluded.

Counsel for defendant began his argument by discussing law enforcement's entry into defendant's home in tactical gear and initial placement of handcuffs on defendant. The trial court interrupted counsel and stated, "Assuming for the sake of argument that your client was in custody and being questioned by law enforcement and therefore interrogated. … Are you saying to the Court, then, that it's a matter of whether or not his waiver of *Miranda* rights was … not voluntarily or freely made because of some low intellect he may have?"

Defendant's counsel acknowledged that was part of the issue, but he insisted that a person with a learning disability may not have understood the officers' explanation. He further argued, "So I don't think it's clear he understood his rights.… [I]t's confusing when you have one officer saying 'I'm reading these rights,' and another officer saying

11.

'We're reading these to let you know you're not under arrest.' " Counsel concluded his argument by stating, "I think it's – it wasn't a free and voluntary waiver at that point." In rebuttal argument the prosecution responded that, "the officers [were] making every attempt to let the defendant know that he has these rights, even though he's not under arrest. They understand that, because of the situation, he may feel like he is not free to leave, even though he is."

In its ruling the trial court phrased the issue as "whether or not [defendant] has some lack of capacity to knowingly and voluntarily waive his *Miranda* rights." It recognized the U.S. Supreme Court case *Colorado v. Connelly* (1986) 479 U.S. 157, which held that a mental condition on its own would not render a *Miranda* waiver involuntary. The trial court concluded it must also look at whether or not there was coercive police activity. In making its determination the trial court reasoned as follows:

> "I don't find anything necessarily coercive here. While [defendant] was in his own home – and I do recognize there were at least a dozen Homeland Security and/or ICAT officers in tactical gear. But he was not in the police station, nonetheless. There's nothing inherently coercive, which leads me to believe, though I'm hearing the context of the audio portion, and reviewing also the transcription portion of the audio portion the Court listened to, that this was coercive to the extent that […] any low intelligence or intellectual disabilities that [defendant] might have were not worn in such a way that he was worn down or that this was something involuntary of waiving his rights.
>
> "Under the circumstances, objectively looking and listening to the context of the transcript, Sergeant Rippe, as he questioned initially [defendant], the court does find that the People have borne their burden here, as by preponderance of the evidence, that [… defendant …] has expressly waived his *Miranda* rights. The Court need not determine and assumes solely for the sake of this hearing that [defendant] was in custody. Although, I think arguably it could be stated that he, while told he was free to leave, he was in his own home, and frankly, with officers around, where could he go other than just leaving his home.

"So under the circumstances, the Court does find that *Miranda* was complied with, there was no violation. And accordingly, the statement or any statement may be introduced in the case in chief here."

**D.** *Applicable Law and Standard of Review*

*Miranda* warnings provide a procedural safeguard to protect an individual's Fifth and Fourteenth Amendment right against self-incrimination. (*Florida v. Powell* (2010) 559 U.S. 50, 59.) When *Miranda* warnings are given and understood by the accused, but he or she nevertheless speaks to the police, the defendant impliedly waives the right to remain silent – provided the statement is uncoerced. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381–382.) To be effective, a defendant's *Miranda* waiver must be made " ' "voluntarily, knowingly and intelligently." ' " (*People v. Combs* (2004) 34 Cal.4th 821, 845, quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421.) Relinquishment of *Miranda* rights, including the right to remain silent, " 'must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " (*People v. Combs*, at p. 845.)

In reviewing the voluntariness of a *Miranda* waiver, "[w]e accept [the] trial court's factual findings, provided they are supported by substantial evidence, but we independently review the ultimate legal question." (*People v. Scott* (2011) 52 Cal.4th 452, 480.) That question is simply " 'whether the challenged statement was illegally obtained.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) "Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances.' " (*People v. Neal* (2003) 31 Cal.4th 63, 79.) The appellant bears the burden of demonstrating error in the trial court's ruling. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694.)

"Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' ([*People v.*] *Williams* [(2010)] 49 Cal.4th [405,] 428 and 'inquiry into all the circumstances surrounding the interrogation' (*Fare v. Michael C.* (1979) 442 U.S. 707, 725)." (*People v. Nelson* (2012) 53 Cal.4th 367, 374–375.) " 'The

13.

court in making a voluntariness determination "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." ' " (*People v. Krebs* (2019) 8 Cal.5th 265, 299.)

**E.     *Analysis***

Defendant advances different arguments in support of his contention that the trial court erred in admitting his statements to law enforcement officers based upon an invalid *Miranda* waiver.  None of these arguments are persuasive.  In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them.  (*Colorado v. Spring* (1987) 479 U.S. 564, 574.)  In our independent review of the interview, we decide that the totality of circumstances establishes that defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary.  As defendant was read his rights, he provided verbal affirmation that he understood each right and executed his signature on the waiver form provided by law enforcement.

At no point in the interview did defendant appear to lack the ability to comprehend statements made by the officers.  He generally followed along and freely provided information to the officers.  Although it was established after the interview that defendant had a learning disability, the nature of that disability did not prevent him from understanding the rights available to him.  In fact, defendant clearly understood that officers were in his house and conducting a forensic search of his computer equipment pursuant to a search warrant.  During the interview, defendant expressed his frustration with the length of time that officers would need to keep his computer equipment to complete their search.  Defendant made no explicit admissions that he knowingly searched for child pornography, and he repeatedly insisted that law enforcement would find no child pornography on his computers.

14.

Defendant's contention that the officers made an implicit threat toward defendant regarding his stepbrothers is also misplaced. The officers had probable cause to believe that child pornography existed on one of the computers in the home, and they asked defendant to provide information on the users of the computers to narrow down the scope of their investigation. In response, defendant was the one who made the suggestion that his stepbrothers were around the home and could have been the ones downloading child pornography. Sergeant Rippe's suggestion that officers could contact his father about his stepbrothers was a reasonable approach and not taken to exercise control over defendant.

The transcript of the interview does not contain any evidence of coercion by Sergeant Rippe or Agent Fletes. Both officers provided an extensive explanation of their desire to give a precautionary *Miranda* advisement to defendant. We reject defendant's contention that the officers improperly insisted on obtaining a waiver when defendant was not being arrested or provided an explanation of the purpose of the search. As respondent argues, defendant would likely be claiming on appeal that the *Miranda* warnings were required prior to the interview had Rippe not advised defendant of his rights. Even if we were to accept defendant's contention that the *Miranda* waiver was required, there is no evidence that the waiver was coerced by any improper conduct by law enforcement. The dozen officers were not present in the room during defendant's interview with Rippe and Fletes, and defendant was questioned in his home with repeated reminders that he was free to leave at any time.

A waiver in a similar situation was found to be knowing and voluntary in *People v. Farnam* (2002) 28 Cal.4th 107, where the defendant was in custody and interviewed in a small room the morning after he was arrested, the officer read the *Miranda* advisements, and the defendant indicated he understood his rights and waived them. (*Farnam*, at pp. 181–182.) Thereafter, the officer interrogated the defendant in "a quiet and nonjudgmental manner for approximately two and one-half hours." (*Id*. at p. 182.) "Although [the] defendant was emotional when interviewed (sometimes crying or being

15.

very quiet), he never indicated any desire to have an attorney, to be left alone, or to discontinue questioning." (*Ibid*.)

To the extent defendant claims his waiver was invalid due to his intellectual disability, we similarly reject his argument. "[W]hile mental condition is relevant to an individual's susceptibility to police coercion, a confession must result from coercive state activity before it may be considered involuntary." (*People v. Smith* (2007) 40 Cal.4th 483, 502.) In the present case, there is neither a mental deficit precluding the possibility of a voluntary waiver nor coercive police conduct. Dr. Seymour characterized defendant as having a "mild" intellectual disability and attention deficit disorder. Although Dr. Seymour opined that defendant lacked the capacity to understand the rights he was giving up, the trial court was not required to accept that opinion. Unlike Dr. Seymour, the trial court was provided both the audio recording and transcript of the interview, which provided it greater context and understanding of defendant's interactions with officers.

The trial court properly weighed Sergeant Rippe's testimony that defendant appeared to respond appropriately throughout the interview with the relevant portions of the audio recording when it concluded that defendant's waiver was knowing and voluntary. Our review of the record confirms the trial court's assessment. Defendant's answers indicated voluntary participation in the interview, an awareness of the risks of speaking to law enforcement, and consistent denials of culpability, all while minimizing and explaining his own conduct innocently.

Nothing in the interview suggested the officers were aware of any cognitive limitations by defendant or that they attempted to prey upon them. "[N]one of the police comments here appear to have been calculated to exploit a particular psychological vulnerability of defendant." (*People v. Kelly* (1990) 51 Cal.3d 931, 953.) Under the totality of the circumstances, defendant's learning disabilities do not support a finding of involuntariness, since the record does not show law enforcement used any improper

tactics that took " 'unfair or unlawful advantage of his ignorance, mental condition, or vulnerability to persuasion.' " (See *In re Brian W.* (1981) 125 Cal.App.3d 590, 603 [15-year-old boy with an IQ of 81 validly waived his *Miranda* rights].) Defendant's attempt to challenge the court's pretrial ruling therefore fails.

Finally, we also reject defendant's contention that his statements to law enforcement were made involuntarily such that the trial court erred in admitting them. Respondent correctly asserts that defendant forfeited this argument by failing to raise the issue below. The only argument put forth by defendant's counsel was the voluntariness of his *Miranda* waiver, and no objection was made to the admission of the interview based upon involuntary statements that were a product of coercive police conduct. " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " (*United States v. Olano* (1993) 507 U.S. 725, 731; *People v. Saunders* (1993) 5 Cal.4th 580, 590.) A party cannot argue the lower court erred in failing to conduct an analysis it was never asked to perform. (*People v. Tully* (2012) 54 Cal.4th 952, 980.) Even if we were to excuse forfeiture in this instance, defendant's claim fails on the merits.

"In determining whether a confession was voluntary, '[t]he question is whether [the] defendant's choice to confess was not "essentially free" because his will was overborne.' " (*People v. Massie* (1998) 19 Cal.4th 550, 576; see *Moran v. Burbine*, *supra*, 475 U.S. at p. 421 [a defendant's decision to speak with police "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"].) On appeal, we defer to the trial court's factual findings concerning the circumstances surrounding the interrogation, but we independently review the voluntariness of the defendant's statements under the totality of the circumstances. (*People v. Massie*, at p. 576.) In making this determination, we give great weight to the trier of fact's " ' "considered conclusions" ' " in examining the same

evidence, but reserve final judgment for ourselves. (*People v. Wash* (1993) 6 Cal.4th 215, 236.)

Defendant asserts that armed officers created a coercive environment with citation to *United States v. Song* (2021) 544 F.Supp.3d 929, 936. However, that case concluded that law enforcement acted improperly by failing to provide *Miranda* warnings to the defendant. (*United States v. Song*, at pp. 935–936.) Here, officers did obtain a waiver of defendant's *Miranda* rights given the nature of the investigation. However, the fact that armed officers went into the home to conduct a sweep of the residence and execute a search warrant is not sufficient by itself to render defendant's statements involuntary.[3]

As we discussed above, the conduct of the officers was neither improper nor coercive. The officers were not required to explain the exact type of crime that the search warrant sought evidence in relation to. Indeed, had officers informed defendant that they were investigating the home for evidence of child pornography prior to obtaining a waiver of rights, defendant would have likely made spontaneous admissions in relation to that information. The relevant factors do not demonstrate that defendant's will was overborne. Defendant did not admit to possessing child pornography, and he provided numerous excuses to explain why child pornography was located on one of his computers. This strongly suggests that defendant was in control of what information he wanted to provide law enforcement. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58 [a defendant's calculation on what information to provide does not demonstrate a will overborne by official coercion].)

---

[3] Detective Rippe testified there were up to 20 armed task force officers in tactical gear, and some officers possessed assault rifles. The record does not reveal whether this involved standard procedure for the law enforcement agencies involved or there were special circumstances (e.g., concern about officer safety or evidence preservation) to warrant such a show of force at the defendant's residence. While such practices and tactics can raise legitimate concern and apprehension, the totality of the circumstances here satisfy the legal concerns that are at issue.

At no time did the officers deceive him or embellish the state of the evidence. Instead, the officers eventually told defendant what their investigation had revealed and what they expected to find on at least one computer associated with the IP address he was using. The officers honestly informed him that his computers had been seized from his home, and the computers were being searched while they spoke. In sum, when the totality of circumstances surrounding the October 4, 2012, interview is considered, it does not support a finding that the defendant's statements to officers were the result of coercive police tactics that overcame his will and rendered his statements involuntary. The trial court accordingly did not err in admitting the statement at trial.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P. J.


SNAUFFER, J.

19.